IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **In re: Motion to Compel Compliance with Subpoena Directed to Information Technology Management Services Inc.** | Misc. Action No. 1:24-mc-00152-ABJ-MJS |
| <u>Underlying Case</u><br><br>**Plus One, LLC,**<br><br>　　　　**Plaintiff,**<br><br>　　　　**v.**<br><br>**Capital Relocation Services L.L.C.,**<br><br>　　　　**Defendant.** | Case No. 23-cv-2016 (KMM/JFD)<br>(D. Minn.) |

## REPLY TO MOTION TO INTERVENE

Plaintiff Plus One, LLC ("Plus") does not identify any source code, code repository, user account, or other information it is now seeking that it has not already received in the underlying suit. Intervenor Capital Relocation Services L.L.C. ("CapRelo") has already produced the **entire history** of source code for its CompanionFlex software, provisioned Plus with inspection access to all responsive user accounts showing the complete functionality of that software, and has even accommodated Plus's belated requests for all source code and user accounts to *other* applications that have no relevance to Plus's underlying claims. Neither before nor after filing this motion did Plus request additional discovery from CapRelo concerning its third-party developer, ITMS.

Faced with the impossible task of proving its claims in Minnesota, Plus now channels its resources into burdening this Court and harassing its competitor and the non-party developers with whom its competitor works. As discussed in its opening brief, CapRelo does not object to Plus obtaining document discovery from ITMS, but intervened in this matter out of an abundance of

caution and for a limited purpose: to preclude Plus from violating the parties' carefully negotiated protocol by obtaining third-party discovery of CapRelo's source code, code repositories, APIs, API components, "operable copies" of CompanionFlex user accounts, or "login credentials" to access the same (the "Disputed Discovery")—information Plus has already received during three separate inspections pursuant to the Amended Protective Order ("APO") in the underlying case. Plus's response confirms that CapRelo's motion was warranted. A protective order is therefore necessary to protect CapRelo's highly sensitive business information from its competitor.

As has been explained to Plus repeatedly, ITMS does not have access to CompanionFlex "source code" or "user applications." ITMS's subcontractor, CMC Global, *does* have "access" to CapRelo's source code and software, but *only* that which CapRelo provides—*i.e.*, using login credentials to access the information within **CapRelo's secured systems**. Apparently, Plus would have this Court compel CapRelo's vendor to hand over credentials to access CapRelo's secured network and systems—bypassing the protections of Magistrate Judge John Docherty's APO entirely—all to obtain the very information it has already received (and can continue to receive) in the underlying suit. Plus's current effort is no different than subpoenaing a defendant's non-party IT vendor to obtain login credentials to the defendant's internal email system to "double-check" whether the defendant produced all responsive documents. This is not how discovery works. But more importantly, it is a process not permitted by the APO's clear and binding protocol, which precludes Plus from seeking the Disputed Discovery from any third party.

Before a Court that is not steeped in the issues, Plus's opposition levels meritless allegations of "interference" with subpoenas, "serious questions" concerning the completeness of CapRelo's source code productions, and, astonishingly, that CapRelo does not own the software it built, maintains, and sells to customers (and over which Plus has sued *CapRelo* in the underlying

Minnesota action). As set forth below, Plus's baseless claims are easily debunked—including by the very documents it cites in its opposition. In any event, if Plus is concerned with the "completeness" of CapRelo's productions concerning the Disputed Discovery, its recourse is to raise that issue in the District of Minnesota.

Finally, Plus gives scant effort to explaining how its requests for Disputed Discovery from a third party *do not* violate the APO's clear and binding protocol. They do. Plus musters only a textual argument, but that argument elides the clear language of the APO itself—which is the exclusive vehicle for Plus's access to the Disputed Discovery. The Court should therefore issue a protective order precluding Plus from seeking the Disputed Discovery from ITMS in Request Nos. 3, 5, 9, and 10 of the subpoena. Should the Court have any doubts as to the parties' rights and obligations under the APO, CapRelo respectfully requests this action be transferred to the District of Minnesota for Judge Docherty to decide.

## ARGUMENT

**I.      CapRelo has a clear interest in the Disputed Discovery, justifying intervention.**

"[P]reventing the disclosure of commercially-sensitive and confidential information is a well-established interest sufficient to justify intervention under Rule 24(a)." *100Reporters LLC v. U.S. Dept. of Just.*, 307 F.R.D. 269, 275 (D.D.C. 2014). As a threshold matter, CapRelo's interest in intervening and protecting its interests in the Disputed Discovery should be undisputed. The Court specifically entered a protective order imposing stringent protocol governing discovery of this very information, which is among CapRelo's most competitively sensitive business information. (*See* APO[1] at 1 ("[T]he Court recognizes that documents that will be sought through

---

[1] Plus filed the APO at pages 12-35 of ECF No. 1-2. Because ECF page numbers in this action are obscured by those from the underlying suit, CapRelo cites the APO's original pagination.

3

discovery in the above-captioned action that may contain trade secret or other confidential information as is contemplated by Fed. R. Civ. P. 26(c)(1)(G).").) Instead, Plus resorts to two baseless arguments that CapRelo "may not" have an interest in protecting the confidentiality of its source code or software. (ECF No. 17-1 ("Opp'n") at 7.) Both arguments fail.

*First*, Plus points out that CapRelo's Master Services Agreement ("MSA") with ITMS identifies "JK Moving Services" as a party to that Agreement. (*Id.*) JK Moving & Storage, Inc. is the parent company of CapRelo. *See* ECF No. 10, *Plus One, LLC v. Capital Relocation Services, L.L.C.*, No. 23-cv-2016 (D. Minn. Aug. 16, 2023). No matter which of these entities is identified as a "party," it is CapRelo that built, maintains, and administers CompanionFlex to its customers and that has worked with ITMS pursuant to the MSA. (*Accord* ECF No. 18-6 at 2 ("ITMS has no relationship with JK Moving involving Core-Flex/Companion-Flex.").) The MSA was signed (and is overseen) by Wesam Sarsour, CapRelo's Vice President of Information Technology. *See* ECF No. 55 ¶¶ 5–6, *Plus One, LLC v. Capital Relocation Services, L.L.C.*, No. 23-cv-2016 (D. Minn. Sept. 22, 2023) (attesting to employment as "CapRelo's Vice President of Information Technology"). Many documents Plus has filed here confirm that ITMS's course of dealing is with CapRelo—not JK Moving. (*E.g.*, ECF Nos. 19-6, 19-7, 19-8, 19-11.)

Regardless, even accepting Plus's counterfactual argument that JK Moving—and not CapRelo—is ITMS's "counterparty" to the MSA, the fact remains that "[a]ll Confidential Information disclosed under [that] Agreement, including information in computer software (or held in electronic storage media) will remain the property of Owner." (ECF No. 17-5 ¶ 10(e).) Plus cannot escape that CapRelo—the proprietor of CompanionFlex and JK Moving's wholly-owned subsidiary—has an interest in guarding the confidentiality of CompanionFlex from its competitor.

*Second*, Plus's argument that "ITMS[] actually 'owns' the source code at issue" is

4

nonsense. (Opp'n at 7; *see also* ECF No. 19-1 at 11 ("ITMS alone, and neither JK Moving nor CapRelo, owns the rights to the CompanionFlex software.").) In so arguing, Plus not only defies common sense, but asks the Court to ignore both the express terms of the MSA and the shared understanding of the parties to that Agreement. CompanionFlex predates CapRelo's relationships with ITMS, and therefore has "remain[ed] the property of Owner [*i.e.*, CapRelo]." (ECF No. 17-5 ¶ 10(e).) This ownership includes "computer code owned by Company prior to engaging Contractor." (*Id.* ¶ 12.) Unsurprisingly, this is also true for work product (*i.e.*, source code and software updates) developed during CapRelo's relationship with ITMS. The MSA states: "Upon payment of all monies due under this Agreement, including any Work Statement, **Contractor will assign all such materials and the rights as it relates to the work product** created by Company [*sic*] pursuant to the Work Statement **to Company**, including all copyrights, patents, registrations therefor, or such other protection as may be appropriate to the subject matter, and any extensions and renewals thereof." (ECF No. 17-5 ¶ 12 (emphasis added).) ITMS agrees. (*See* ECF No. 18-6 at 2 ("ITMS has no responsive information **because these are CapRelo's software** . . . and ITMS does not work on or have access to CapRelo's software.").)[2]

      As shown, Plus's arguments are easily debunked. CapRelo easily establishes a sufficient interest in protecting the Disputed Discovery from improper disclosure.

## II.     CapRelo has not "waived" its rights to intervene and protect its trade secrets.

      Plus next argues that CapRelo has "waived any objection to the ITMS Subpoena." (Opp'n

---

[2] If, as Plus argues, CapRelo does not own the software it developed, maintains, and sells to customers, and CompanionFlex is instead owned by ITMS, or by JK Moving, Plus does not explain why it alleges otherwise in the underlying action, nor why it sued CapRelo (and not those parties) for developing and offering CompanionFlex "to consumers." *See* Am. Compl. [ECF No. 50], *Plus One, LLC v. Capital Relocation Services L.L.C.*, No. 23-cv-2016 (D. Minn. Sept. 20, 2023). Were Plus's arguments to this Court credited, Plus's entire lawsuit would crumble.

at 7.) This is false. Consistent with procedural rules and federal practice, CapRelo promptly sought intervention before any potential or ordered disclosure of the Disputed Discovery. CapRelo has not moved to quash Plus's subpoena under Rule 45 and has made clear it "takes no position on the remainder of the Subpoena or its constituent document requests."[3] (ECF No. 9-1 at 2). Instead, CapRelo seeks only to intervene under Rule 24 for the limited purpose of obtaining a protective order under Rule 26 prohibiting the disclosure of certain sensitive materials in violation of an existing Court Order. Neither Plus nor ITMS will be prejudiced by such relief, making CapRelo's intervention both timely and appropriate.

The Federal Rules do not impose a deadline for a motion to intervene. Instead, the "timeliness" of a motion to intervene is judged "in consideration of all the circumstances." *Roane v. Leonhart,* 741 F.3d 147, 151 (D.D.C. 2014). Such factors include the "time elapsed since inception of the suit, the purpose for which intervention is sought, the need for intervention as a means of preserving the applicant's rights, and the probability of prejudice to those already parties in the case." *Karsner v. Lothian,* 532 F. 3d 876, 886 (D.D.C. 2008) (reversing denial of motion to intervene when intervention was sought within one month of suit's initiation). Whether "any delay in seeking intervention unfairly disadvantaged the original parties" is paramount in this analysis. *Roane,* 741 F.3d at 151–152 (cleaned up).

*First*, there is no "delay" to speak of. It is reasonable and customary for parties to seek a Court's protection *when* their sensitive material becomes at risk of disclosure. The converse is not necessarily true—*i.e.*, parties do not tend to seek the Court's involvement when their sensitive

---

[3] Plus conflates CapRelo's duties with those of a subpoenaed party to object, simultaneously ignoring its own duty to abide by a Court's standing order—suggesting it may violate such mandates if an opposing party does not immediately correct them. That is not the standard, nor does CapRelo's conduct effect any waiver of its ability to intervene as "of right" under Fed. R. Civ. P. 24(a)(2).

6

material is *not* at risk of disclosure or when certain guardrails are already in place to limit access to the same. Until Plus filed this action, CapRelo did not reasonably believe its interests were at risk, having negotiated a binding discovery protocol governing the Disputed Discovery, as reflected in the APO, and knowing that ITMS did not possess or have "access" to the Disputed Discovery. Ordinarily, when a third party receives a subpoena and intends to produce materials that are subject to another's rights or privileges, that third party will then provide notice of the anticipated disclosure, permitting them to review and assert any applicable rights or to seek a protective order from the Court (prior to the expected disclosure). This is particularly true when, as here, a party has contractual rights in the requested discovery.[4] If that third party does not possess such materials, the need for corresponding protections or court intervention should be obviated.[5]

When the subpoenaing party nevertheless moves the court to compel third-party disclosure—defying a Court's existing protective order and raising arguments of fourth-party control—the risk of impermissible disclosure materializes. This is precisely what has transpired here: CapRelo promptly intervened when Plus initiated this action to compel ITMS to disclose the

---

[4] The MSA states in relevant part: "In the event Recipient is required by law, regulations, or court order to disclose any of Owner's Confidential Information, Recipient will promptly notify Owner in writing prior to making any such disclosure to facilitate Owner seeking a protective order or other appropriate remedy from the proper authority. Recipient agrees to cooperate with Owner in seeking such order or other remedy. Recipient further agrees that if Owner is not successful in precluding the requesting legal body from requiring the disclosure of the Confidential Information, it will furnish only that portion of the Confidential Information that is legally required and will exercise all legal efforts to obtain reliable assurance that confidential treatment will be accorded the Confidential Information." (ECF No. 17-5 ¶ 10.d.)

[5] At no time before Plus filed this action did ITMS notify CapRelo that it possessed or had access to the Disputed Discovery. To the contrary, it is CapRelo and ITMS's shared understanding and belief that ITMS does not possess or have access to those materials. (*See* ECF No. 9-2 ¶ 11; ECF No. 18-6 at 3 ("For Request Nos. 9 and 10 (and similar to Request No. 5), ITMS has no responsive information because **only its subcontractors have access to CapRelo's proprietary software, and that is only through CapRelo's platform directly**.").) Plus nevertheless contends that ITMS has "control" of a fourth party's access to the Disputed Discovery, necessitating this intervention and the requested protective order.

Disputed Discovery—discovery that is strictly (and exclusively) governed by the APO. When CapRelo demanded Plus withdraw the violative requests from its motion, Plus refused.[6] Days later, CapRelo filed its motion. No delay occurred, as there was no action pending in which earlier intervention was possible.

*Second*, CapRelo's intervention does not cause prejudice to either Plus or ITMS. As noted, CapRelo moved to intervene and for a protective order just eighteen days after Plus filed this action. CapRelo's motion was filed before the deadline for any responsive briefs to Plus's motion to compel, and within days of Plus's refusal to limit the at-issue requests. The motions will be heard together. On the other hand, intervention ensures CapRelo's rights and interests in its proprietary trade secrets are protected, holds Plus accountable to its existing duties under the APO, and apprises the Court of those duties.

Plus's decades'-old authorities are neither analogous nor applicable here, but instead reinforce CapRelo's timeliness. In each case, the documents had been already produced or were ordered to be produced without a protective order in place. *Nestle Foods Corp. v. Aetna Cas. & Sur. Co.*, 129 F.R.D. 483, 486–487 (D.N.J. 1990) (motion filed two months after documents were *produced*); *U.S. v. Panhandle E. Corp.*, 118 F.R.D. 348, 350–51 (D. Del. 1988) (motion filed one month after production of documents was ordered to have occurred); *U.S. v. IBM Corp.*, 70 F.R.D. 700, 701 (S.D.N.Y. 1976) (motion "filed weeks after [third party] produced documents subject to the subpoena"). ITMS has not produced the Disputed Discovery, nor has the Court ordered its production. CapRelo moved promptly upon Plus filing this action such that its motion can be heard

---

[6] Contrary to Plus's statements in opposition, CapRelo fully satisfied its meet and confer obligations before filing the instant motion. The incomplete email thread Plus cites to show otherwise (ECF No. 16-10) has been filed in complete form as Exhibit C to the Second Landy Declaration.

8

in tandem with Plus's own.

### III. CapRelo has not "interfered with" the ITMS subpoena.

Plus next claims that CapRelo has "interfered" with its subpoena to ITMS. (Opp'n at 8–12.) This is false.

***First***, Plus selectively quotes an internal email from November 3, 2023—**more than one year ago**—in which CapRelo discussed issuing preservation notices to ITMS and another former vendor, 1Rivet. (*Id.* at 8 (citing ECF No. 17-2).) This email was sent before any discovery had occurred in the underlying action and nine months before Plus served the August 2024 subpoena on ITMS. Its full contents show that CapRelo was working diligently to preserve any potentially relevant discovery ***before*** determining whether third-party productions would be necessary:

> When you have a chance, could you please send me contact information for whoever you think I should touch base with from ITMS? Our plan is to slow roll things with 1Rivet and ITMS **until we have a better sense of what Plus will seek from them and what we actually need that we don't already have. So my plan is to let ITMS know that, for now, we just need them to broadly preserve anything that might be relevant—not to export or send us anything.**

(ECF No. 17-2 at CAPRELO_000298113 (emphasis added).) Plus never explains how an email ensuring that evidence is preserved supports their belated allegations of subpoena interference. After this email was sent, CapRelo promptly issued preservation notices and conducted a thorough investigation to determine what responsive discovery, if any, it needed to obtain from these third parties to fulfill its discovery obligations in the underlying suit.

To bolster its argument of interference, Plus states there is "no indication that CapRelo has collected and produced documents from ITMS." (Opp'n at 2, 9.) This is true, and Plus knows why: all work performed by ITMS subcontractors on CompanionFlex and its constituent source code has occurred in secured environments hosted by CapRelo. Plus's own filings acknowledge this. (*E.g.*, ECF No. 19-1 at (citing documents showing CMC Global's use of CapRelo's "project

management and collaboration platform used by software developers"); *see also* ECF No. 16-11 at 3 ("For Request Nos. 9 and 10 (and similar to Request No. 5), ITMS has no responsive information because only its subcontractors have access to CapRelo's proprietary software, **and that is only through CapRelo's platform directly**.").) As explained in its opening brief, CapRelo conducted an exhaustive review of documents relating to or mentioning ITMS and its previous subcontractor, Savvycom, and produced all responsive documents. (*See* ECF No. 9-2 ¶ 8.) Plus did not object to CapRelo's disclosed search and review methods. After a thorough investigation, CapRelo identified no additional responsive information in the possession of ITMS or its subcontractors that CapRelo did not already possess. Before serving the ITMS subpoena or filing this action, Plus **never** raised any concern with CapRelo that "ITMS" documents were wrongfully withheld from its production. It does not do so now. Nor does Plus cite new documents from ITMS's production and show they were wrongfully withheld from CapRelo's own productions.[7] If Plus did have such concerns, its remedy would be raising them in the underlying suit, where the parties have engaged in rigorous (and ongoing) discovery motion practice.

---

[7] Plus highlights only that CapRelo has "refused to produce any documents or information regarding one of ITMS's software development sub-contractors, CMC Global, altogether." (Opp'n at 4.) This not true, though it is not an issue for this Court. By way of background, CMC Global did not begin working on CompanionFlex until December 2023, years after the alleged conduct forming Plus's claims of misappropriation. CapRelo therefore objected to this line of discovery as irrelevant and unduly burdensome, and Plus did not move to compel in the underlying action. (ECF No. 16-5 at 3 ("Plus's claims were made roughly five months before CapRelo's relationship with CMC Global, and its Amended Complaint alleged that previous iterations of CompanionFlex, developed by other third parties, were created with alleged trade secrets and confidential information 'misappropriated' years before CMC Global performed any work related to CompanionFlex.").) CapRelo has in fact produced documents and information (including all source code) reflecting work that CMC Global performed, but it has not conducted an independent search and review for *any* documents relating to CMC Global (as it has for other vendors). In any case, and to avoid the needless dispute in which the parties are presently embroiled, CapRelo has never objected to Plus's subpoena to ITMS insofar as it seeks documents relating to CMC Global. If Plus wishes to challenge CapRelo's objection to producing every document relating to CMC Global, it may do so in the underlying action.

10

Next, Plus argues that CapRelo improperly "pressured ITMS to not fully comply with the Subpoena" after Plus filed this action, including by communicating that the Disputed Discovery "belongs to CapRelo alone pursuant to the [MSA]." (Opp'n at 10–11 (quoting ECF No. 17-6).) CapRelo has acted within its rights. CapRelo never advised ITMS against responding to or complying with Plus's subpoena. To the contrary, after demanding that Plus withdraw its motion to compel the Disputed Discovery, CapRelo encouraged ITMS's compliance—even recommending that ITMS obtain counsel for that purpose. In doing so, CapRelo acted only to ensure that its rights to pursue and obtain a protective order were preserved before any unlawful disclosure of the Disputed Discovery occurred—*i.e.*, to protect ***information owned solely by CapRelo under the MSA and that resides exclusively in CapRelo's secured systems***. Specifically, CapRelo wrote to ITMS:

> Should Plus persist in seeking this information from ITMS, including in connection with its newly filed motion against ITMS in the District of Columbia, **CapRelo will intervene and seek a protective order from the Court prohibiting Plus from continuing to seek this information**. **In the meantime**, we ask for your assurance that ITMS will honor the terms of the Master Services Agreement and the Amended Protective Order by not producing, or furnishing Plus with access to, information sought by Request Nos. 5, 9, and 10 of the subpoena, including any of CapRelo's source code, any code repositories, credentials to user or administrative accounts, APIs or API components, or other 'back-end user access.'"

(ECF No. 17-6 at CAPRELO_000298116.) CapRelo wrote this request in accordance with its rights under the MSA and the terms of the District of Minnesota's APO. (*See supra*, n.4 (outlining CapRelo's contractual rights to obtain ITMS's cooperation to prevent unlawful discovery of its information, including during efforts to obtain protective order).) Seventeen days later, CapRelo timely asserted these rights by filing the instant motion, by which time it had already spoken and exchanged several emails with Plus to halt its unlawful effort to access CapRelo's trade secrets through third parties before resorting to Court intervention. (*See* Landy Decl. Ex. C.)

Finally, the authorities on which Plus relies to accuse CapRelo of interference are not analogous. In *Price v. Trans Union LLC*, for instance, an attorney advised third parties "not to respond" to subpoenas, while at the same time failing to ever involve the court. 847 F.Supp.2d 788, 794–95 (E.D. Pa. 2012). In *Moses v. Am. Apparel Retail, Inc.*, a party filed to abide by the court's orders, failed to appear at depositions, and committed many other acts of obstruction and deception. 2015 WL 4665968, at *13 (W.D. Tenn. Aug. 6, 2015). That did not occur here. Instead, CapRelo acted in accord with *Furth v. Zanic* (on which Plus also relies), which instructs the "proper action" is to promptly "move for a protective order." 2008 WL 11380207, at *1 n.1 (N.D. Ohio Oct. 15, 2008); *see also Raya v. Barka*, 2022 WL 17905528, at *4 (S.D. Cal. Dec. 23, 2022) (finding no bad faith in request that subpoena recipient not disclose disputed discovery pending resolution pending discovery dispute, as such request "did not . . . usurp the authority of the court"); *Lofton v. Verizon Wireless (VAW) LLC*, 308 F.R.D. 276, 290 (N.D. Cal. 2015) (similar). And CapRelo did so even while encouraging ITMS that it *should* produce "that portion of the Confidential Information that is legally required." (Opp'n at 10.) CapRelo took these measures out of an abundance of caution—even though ITMS ultimately did not (and does not) possess the Disputed Discovery.[8]

### IV. Plus's efforts to obtain the Disputed Discovery via third parties violates the District of Minnesota's Amended Protective Order.

Plus's efforts to obtain the Disputed Discovery directly violate Judge Docherty's APO. Ignoring the reality that it seeks to compel a third party to produce information that is owned and

---

[8] Contrary to Plus's suggestion that CapRelo's good faith efforts to preserve its rights is sanctionable, it is Plus's behavior that warrants the Court's admonishment. Plus's refusal to withdraw the Disputed Discovery from its pending motion—in clear violation of a Court Order—has created excessive and needless litigation expense. *See, e.g., Hudson v. Am. Fed'n of Gov't Emps.*, 2023 WL 8234191, at *3–4 (D.D.C. Nov. 28, 2023) (awarding fees under 28 U.S.C. § 1927).

possessed by CapRelo alone, Plus offers a flawed textual argument. In Plus's view, it may disregard the APO entirely and compel a third party to produce CapRelo's source code and "credentials" to access its secured systems because the APO's "use of lower-case 'p' [means] a non-party may have access to a capital 'P' Party's source code." (Opp'n at 12–13.) This is wrong.

The APO does not, in fact, identify CapRelo or Plus as "Parties." Rather, it does the opposite, denoting "parties"—and even defining them—in the common form: "The term '**party**' means a party to this action." (APO at 2 (emphasis in original).) By contrast, a person or entity that is *not* a "party" in the underlying suit is consistently denoted as such throughout the APO (22 times) by the term "non-party." (*E.g.*, *id.* at 2 ("A **party or non-party** disclosing or producing a document may designate it as "CONFIDENTIAL" if the **party or non-party** contends that it contains confidential information.") (emphasis added).) This is equally true for non-parties, like ITMS, who are served with third-party subpoenas. (*Id.* at 20 ("A party serving a subpoena on a **non-party** must simultaneously serve a copy of this Order and of Local Rule 5.6.") (emphasis added).) Although the APO contains protocol governing the production by "non-parties" of materials designated "Confidential" or "Highly Confidential – Attorney' Eyes Only," (*id.* at 3), the sweeping source code protocol makes no such reference to non-parties, (*id.* at 9–15). Simply put, even a textualist reading of the APO does not allow or contemplate that ITMS, a non-party, may be compelled to produce CapRelo's source code or other Disputed Discovery at all, let alone in a method and manner that's inconsistent with its carefully crafted protections. (*See* ECF No. 9-1 at 11–13 (outlining myriad ways Plus's subpoena violates the APO protocol governing Disputed Discovery).) The parties' separately negotiated protocol for software user account inspections, crafted in harmony with the APO's source code protections, similarly does not contemplate a non-party's production of either party's software (or login "credentials" to that software) outside of its

mutually binding terms. (ECF No. 9-3 at 6–8.)

Plus's current tactics violate the APO and potentially the law. Plus is CapRelo's competitor, and it now seeks to compel a third party to produce CapRelo's highly confidential source code, code repositories, "operable copies" of CapRelo's software, and login "credentials" to CapRelo's secured systems. The only access that ITMS's subcontractor, CMC Global, maintains to the Disputed Discovery is that which CapRelo provides: through login credentials to systems and environments that CapRelo hosts in a secured network.[9] The relief Plus now seeks is the functional equivalent of a plaintiff seeking third-party discovery from a defendant's security contractor by compelling that contractor to use its key fob to enter the defendant's secured offices and retrieve documents stored in file cabinets located there; or compelling a defendant's non-party IT vendor to produce administrative login credentials to access the defendant's internal email system. The sole basis of this request is that the security guard has "access" to those file cabinets, or that the IT vendor has "access" to the defendant's internal emails. This is not a proper use of third-party discovery.

In sum, Plus's tactics are brazen, unprecedented, and would render meaningless the carefully crafted safeguards imposed by the District of Minnesota in the APO. If Plus believes the discovery it has received from CapRelo is inadequate (it is not), or is dissatisfied with the Disputed Discovery protocol to which it agreed to be bound, its recourse is to seek relief in the underlying suit. It has not. Instead, Plus seeks to involve third parties and this Court in needless process in

---

[9] As ITMS has confirmed, it does not have access to the Disputed Discovery. (ECF No. 16-11 at 2–3 ("For Request Nos. 9 and 10 (and similar to Request No. 5), **ITMS has no responsive information because only its subcontractors have access to CapRelo's proprietary software, and that is only through CapRelo's platform directly**.").) In its attempt to dispute this reality, Plus has filed redacted documents plainly depicting login credentials issued to CMC Global—not to ITMS. (ECF No. 19-1 at 12 (citing ECF No. 19-11 at 2).)

14

hopes of acquiring here what it cannot in Minnesota. Because Plus's subpoena and motion to compel violate the APO, the Court should issue a protective order precluding Plus from obtaining any of the Disputed Discovery sought by Request Nos. 3, 5, 9, and 10. Should the Court have any doubts concerning the parties' rights and duties regarding the Disputed Discovery under the APO, CapRelo respectfully requests this action be transferred to the District of Minnesota, which is best situated to resolve any genuine concerns regarding the scope and requirements of its Order. *See Flynn v. FCA US LLC*, 216 F.Supp.3d 44, 48 (D.D.C. 2016) ("Because the issuing court has been able to intimately observe the parties and counsel involved in the underlying litigation over the course of the past 15 months, it is much better positioned than this Court to determine whether any of Auto–ISAC's fears about the inappropriate dissemination of confidential information in violation of a protective order have any merit.").

**V.    Plus has no "right" or basis to test the completeness of CapRelo's productions concerning the Disputed Discovery through third-party subpoenas seeking the same information stored in the same location: within CapRelo's systems.**

The Court should reject Plus's claimed "right" to test the completeness of CapRelo's source code productions using an unprecedented tactic of compelling third parties to provide access to information residing in CapRelo's own systems. (*See* Opp'n at 14–16.) Plus's proffered right lacks legal support and, once again, is built on a false history of the parties' dealings in discovery. Plus's entire argument on this issue is a sideshow that should never have been raised in this Court. For present purposes, this Court *should* only need know that Plus has never moved in the District of Minnesota to compel production of any of the source code or other Disputed Discovery it now seeks—despite always being at liberty to do so. Regrettably, however, Plus's misrepresentation of events warrants a fuller recounting.

First, Plus does not dispute (and it cannot) that ***it has received access to the entire history***

15

***of CompanionFlex source code—both active and archived code—including revision histories***.

(ECF No. 9-2 ¶ 10.) After the first of Plus's three inspections, it requested to inspect additional source code repositories, including source code for an entirely different application—Companion—that predates Plus's own software and which has no relevance to the claims in the underlying action. Plus also served a document request, for the first time, to inspect access to user accounts for Companion. Despite the negligible relevance of this information, CapRelo accommodated Plus's request, then explaining:

> First, it's not true that CapRelo did not provide inspection access to "all account types" for CompanionFlex. As clearly explained on prior occasions, CapRelo provisioned inspection access to each of the requested user account types for CompanionFlex. And as already explained, insofar as Plus has raised concerns with access to other user accounts, those accounts are to Companion—something that Plus had not requested, through discovery requests or otherwise, before proceeding with its inspection on August 5-8. It was not until August 15, by way of its fourth set of document requests, that Plus requested discovery into "operable copies" of Companion. As reflected in CapRelo's responses and objections to RFP No. 43, and without waiving its objections, CapRelo is willing to make a Companion user test account available for inspection subject to the Amended Protective Order and the parties' separately agreed-to protocol for expert inspections of user accounts.
>
> Your email also requests inspection access to source code predating November 2022, at which point CompanionFlex and Companion were rewritten. These older branches of code are no longer in use, but have been archived, so it will take time and resources to restore them. When we have done so, we are willing to provision Plus's inspection access to this source code in the same format, and equipped with the same tools, that the parties agreed to for Plus's first source code inspection.

(ECF No. 16-4 at 7–8.) CapRelo then provided access to all source code and Companion user accounts, which Plus inspected on two occasions in October and November (pursuant to the terms of the APO).[10] (ECF No. 9-2 ¶ 4.)

---

[10] Using conjecture and false claims CapRelo has repeatedly dispelled, Plus claims a "right to use non-party discovery to rest the completeness of CapRelo's productions" of source code and software. (Opp'n at 16.) Plus has no such right. *See BNSF Ry. Co. v. Ctr. for Asbestos Related Disease, Inc.*, 2022 WL 1442854, at *4 (D. Mont. May 6, 2022) ("BNSF admits the current subpoena is aimed at capturing what CARD *may* have left out. But Rule 45 subpoenas do not

Plus also argues that CapRelo has not produced "the earliest versions of its accused CompanionFlex product." (Opp'n at 17.) As Plus puts it, "ITMS may have the ability to produce those, however, given its contractual rights to obtain materials from its sub-contractors." (*Id.*) Plus knows this is not the case. Months after its first inspection of CompanionFlex, Plus wrote CapRelo demanding it provide inspection access to "user accounts" for outdated and inoperable "versions" of CompanionFlex. CapRelo promptly explained that these "versions" of the software's front-end were no longer in use and that the application's other back-end components had been updated, meaning old source code could not be executed to recreate a legacy user experience, but that Plus in any case would have access to the entire history of source code—including for all legacy versions of the software. (ECF No. 16-4 at 7–8.) Pressed by Plus to "explain" the unavailability of legacy user experiences that no longer exist, CapRelo stated:

> Your contention that these earlier versions were "destroyed" is not true and reflects an actual or feigned misunderstanding of how web applications are built and maintained. Although we are surprised at the apparent need to explain this issue, we'll endeavor to do so here.
>
> The relevant applications—CompanionFlex and Companion—were originally written in Angular. In November 2022, these applications were rewritten in React to facilitate the launch of a native mobile application. In April 2023, when the applications were released in React, they were connected with CapRelo's internal operating system and database, which were similarly updated for compatibility with React. (*See, e.g.*, CapRelo's Response to Interrogatory No. 1.) Naturally, the instances of these applications written in Angular were disconnected. As you no doubt already know, this legacy code cannot be run without a connected and operable back end. Because many back-end operating components were correspondingly updated during this transition, the Angular code cannot simply be executed, and reconnected to these back-end components, with the flip of a switch. Instead, and by our estimation, CapRelo would need a small army of dedicated resources to recreate the legacy back end, and with no guarantee of achieving a precise functioning replica of the Angular front end. This would require spinning

---

function as a double check on the sufficiency of a production made by a party under Rule 34.") (emphasis in original). Moreover, Plus is not conducting "non-party discovery"; it seeks to compel a third party to produce information stored only in *CapRelo's systems*. A dispute over the "completeness" of discovery from CapRelo's systems is, quintessentially, a matter left for the District of Minnesota.

> out a new instance of CapRelo's internal operating system compatible with Angular 11, recreating or leveraging old database archives that have structurally changed over time (e.g., with new or modified tables, columns, file options, and procedures), rebuilding APIs that have similarly evolved over time, repurchasing web certifications, and working through any other infrastructure that has changed during subsequent phases. After recreating the back end, CapRelo would then need to repopulate new data and files and inevitably spend substantial time and resources troubleshooting any errors encountered on the front end (by working strictly from the back end so as, to the extent practicable, preserve the archived code).
>
> At bottom, Plus has everything it needs to prove up its baseless claims. Plus has set out to show that CompanionFlex was developed using trade secrets associated with Point C, and its latest theory is that CapRelo did so by reverse engineering Point C source code. At your request, we have already provided unfettered access to CompanionFlex's existing front end *and* **the native source code underlying CompanionFlex, Companion, and associated APIs (including revision histories)**. At your latest request, Plus will now also receive access to Companion's front end and **all archived source code, including revision histories**.  Using the requested viewing tools, including Visual Studio 2022, Plus's experts have everything they need to understand the entire development history and functionality of CompanionFlex and Companion. (ECF No. 215 at 17:3-4 ("[T]he best evidence of how software functions is source code.") (J. Talcott).) This is in addition the extensive number of documents already produced touching on every material aspect of the design, development, and operability of CompanionFlex.

(ECF No. 16-4 at 5–6 (emphasis added).)

In plain terms, CapRelo has provided Plus with the entire source code history for CompanionFlex. The archived code for legacy versions of the software cannot simply be executed to provide Plus with access to the "look and feel" of the software as it existed then. That's because the software's many other components—including databases, APIs, operating systems, and other back-end components—have updated over time and cannot simply be reconnected with old source code. What Plus *actually* disputes is CapRelo's objection that doing so would be inappropriate, unduly burdensome, and not proportional to the needs of the action—a discovery dispute that it must raise in the underlying suit.

In sum, CapRelo has provided fulsome discovery in the underlying action, even accommodating Plus's piecemeal demands for additional costly discovery of negligible relevance.

Plus has no legal or factual basis to test the "completeness" of CapRelo's productions concerning the Disputed Discovery. Regardless, if Plus believes CapRelo's productions of source code and user accounts are incomplete (they are not), Plus must raise those issues in the District of Minnesota and refrain from measures that are in deliberate violation of that Court's APO.

## CONCLUSION

For the foregoing reasons, and those set forth in its earlier Memorandum, CapRelo respectfully requests the Court grant its motion to intervene and issue a protective order precluding Plus from seeking the Disputed Discovery from ITMS in Request Nos. 3, 5, 9, and 10 of the subject subpoena.

Dated: December 13, 2024

By: /s/Barry M. Landy
Barry M. Landy (*pro hac vice*)
CIRESI CONLIN LLP
225 South Sixth Street, Suite 4600
Minneapolis, MN 55402
(612) 361-8224 Telephone
(612) 314-4761 Facsimile
*bml@ciresiconlin.com*

Elaine Charlson Bredehoft, D.C. Bar No.441425
Adam S. Nadelhaft, D.C. Bar No. 490124
CHARLSON BREDEHOFT COHEN
BROWN & NADELHAFT, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, Virginia 20190
(703) 318-6800 Telephone
(703) 318-6808 Facsimile
*ebredehoft@cbcblaw.com*
*anadelhaft@cbccblaw.com*

*Counsel for Capital Relocation Services L.L.C.*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 13th day of December, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Charles D. Tobin
BALLARD SPAHR LLP
1909 K Street, NW
12th Floor
Washington, DC 20006
Tel: (202) 661-2218
Fax: (202) 661-2299
Email: tobinc@ballardspahr.com

Jonathon A. Talcott
BALLARD SPAHR LLP
2000 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Tel: (612) 371-3211
Fax: (612) 371-3207
Email: talcottj@ballardspahr.com

Benjamin N. Simler
BALLARD SPAHR LLP
1735 market Street, 51st Floor
Philadelphia, PA 19103
Tel: (215) 665-8500
Email: simlerb@ballardspahr.com

*Counsel for Petitioner*
PLUS ONE, LLC

Hugham Chan
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: (202) 624-2691
Fax: (202) 628-5116
Email: hchan@crowell.com

*Counsel for ITMS*

By:  /s/Barry M. Landy
     Barry M. Landy (*pro hac vice*)